UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03969-RGK | Date | July 15, 2011 |
|---|---|---|---|
| Title | **SIEGEL v. FDIC (In Re INDYMAC BANCORP INC.)** | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | | |
|---|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:** **(IN CHAMBERS) Order Re: Defendant's Motion to Bifurcate and Withdraw Reference from U.S. Bankruptcy Court (DE 1)**

## I. INTRODUCTION

The parties' dispute centers around the ownership of over fifty million dollars in tax refunds. The moving party wishes that dispute to be heard in the district court, the non-moving party argues for it to remain in bankruptcy court.

This Motion arises from an adversary proceeding pending in the United States Bankruptcy Court from the Central District of California ("Bankruptcy Court"). Defendant and moving party is the Federal Deposit Insurance Corporation in its capacity as Receiver for IndyMac Bank ("FDIC-R" and "Bank" respectively). Plaintiff of the adversary proceeding and non-moving party is Alfred H. Siegel as Trustee ("Trustee") for IndyMac Bancorp ("Bancorp"). The FDIC-R seeks to withdraw, in part, the reference to Bankruptcy Court for the Court to determine whether the tax refunds belong to the Trustee or the FDIC-R. The Trustee opposes the Motion.

For the reasons discussed below, the Motion to Withdraw the Reference is **DENIED.**

## II. FACTUAL BACKGROUND

On July 11, 2008, the Office of Thrift Supervision ("OTS") appointed the FDIC as the Receiver for Bank. Twenty days later, Bank's grandparent holding company, Bancorp, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Shortly thereafter, Alfred H. Siegel was appointed as Trustee of the Bancorp estate.

Before the bankruptcy and the receivership, Bancorp and Bank had executed a tax sharing agreement ("TSA"), which allocated various tax responsibilities, one of which was that Bancorp

would file consolidated tax returns for both companies and therefore, receive any tax refunds. In the wake of the receivership and bankruptcy, both parties sought the tax refunds from the Internal Revenue Service ("IRS").

On November 26, 2008, the FDIC-R filed a Proof of Claim against Bancorp's estate for over five billion dollars. Section 6 of the Proof of Claim contains the claim to the tax refunds and the FDIC-R's assertions of ownership of the tax refunds. It is the only relevant claim in the present action.

On June 11, 2009, the Trustee filed a complaint ("Complaint") against the FDIC-R in Bankruptcy Court, commencing the adversary proceeding. The Complaint objected to the Proof of Claim, sought to subordinate it and further counterclaimed for declaratory relief on the issue of ownership of the tax refunds for the years 2000 through 2008. The next day, the Trustee filed a separate complaint against the FDIC as Receiver of Bank and in its corporate capacity, in the federal district court for the District of Columbia ("DC Action"). *Siegel v. FDIC*, No. 1:09-cv-01088-RLW, (D.D.C. June 12, 2009). The DC Action also seeks, in part, declaratory relief on ownership of tax refunds for the years 2002 through 2007.

On July 10, 2009, the parties filed in Bankruptcy Court a stipulation to stay the adversary proceeding in order to negotiate a consensual resolution between themselves. (Stipulation to Stay Proceeding and Continue Status Conference at ¶ C, No. 2:08-bk-21752-BB (C.D. Cal. Jul. 7, 2009)). The parties subsequently stipulated four more times to stay the proceeding, ultimately extending the FDIC-R's last day to respond to May 9, 2011.

Between November 2010 and March 8, 2011, the Trustee and the FDIC-R unsuccessfully attempted to mediate the adversary claims. On April 19, 2011, the Trustee filed his First Amended Complaint ("FAC") and a Motion for Summary Judgment ("MSJ").

On May 11, 2011, the FDIC-R filed in this Court the Motion to Bifurcate or Sever and Withdraw Reference of Only "Part" of the Adversary Proceeding Relating to Tax Refund Claims and Offsets ("Motion" or "Motion to Withdraw"). The various parts the FDIC-R seeks to withdraw are best summarized thusly: "Insofar as the FAC seeks a determination of ownership of the Refunds, that issue should be withdrawn from the bankruptcy reference." (Reply page 6 n.4).

### III. **JUDICIAL STANDARD**

A district court can withdraw the reference of bankruptcy matters to the bankruptcy court, in whole or in part. 28 U.S.C. § 157(d) (2006). The withdrawal comes in two forms: mandatory or permissive. *Id.* In either case, a party moving for withdrawal must timely bring the motion. *Id.* The burden of persuasion is on the party seeking withdrawal. *FTC v. First Alliance Mortg. Co.*, 282 B.R. 894, 902 (C.D. Cal 2001).

#### A. **Mandatory Withdrawal**

Withdrawal is mandatory "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

Mandatory withdrawal is required only when a case hinges on substantial and material consideration of federal law. *Sec. Farms v. Int'l Bd. of Teamsters*, 124 F.3d 999, 1008 n.4 (9th Cir. 1997). It is not sufficient that non-Bankruptcy Code federal statutes will simply be considered but that substantial and material consideration of these laws is necessary for the resolution of the

proceeding. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990). The issues must be "significant open and unresolved" and must involve more than "mere application of federal law." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996). A district court must make an "affirmative determination" that such consideration will be required before granting withdrawal. *In Re Ionosphere Clubs, Inc.,* 103 B.R. 416, 419 (S.D.N.Y. 1989) (quoting *In re White Motors*, 42 B.R. 693, 701 (D. Ohio 1984), *aff'd*, 922 F.2d 984 (2d. Cir. 1990).

### B. Permissive Withdrawal

A district court may withdraw of its own discretion for cause shown. 28 U.S.C. § 157(d). In determining whether cause exists, a court "should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Sec. Farms*, 124 F.3d at 1008-09 (9th Cir. 1997). "[I]t is helpful to make the core/non-core determination before considering the other factors because this implicates the efficiency and uniformity factors." *In re Daewoo Motor America*, 302 B.R. 308, 311 (C.D. Cal. 2003) (citing *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2nd Cir. 1993)).

## IV. DISCUSSION

The FDIC-R contends that the issue of which party owns the tax refunds must be mandatorily withdrawn because it requires substantial and material consideration of non-bankruptcy law. In the alternative, the FDIC-R requests that the Court exercise its discretion and permissively withdraw. As discussed below, the Court disagrees that withdrawal is mandated, and declines to permissively withdraw.

The threshold question in evaluating a motion to withdraw is whether the motion was made in a timely manner. *In re Mahlmann*, 149 B.R. 866, 869 (N.D. Ill. 1993); *see, e.g.*, *Sec. Farms*, 124 F.3d at 1007, n.3. Accordingly, the Court begins its analysis there.

### A. Timeliness of the Motion

"A motion to withdraw is timely 'if it was made as promptly as possible in light of the developments in the bankruptcy proceeding.'" *Sec. Farms*, 127 F.3d at 1007 n.3 (quoting *In re Baldwin-United Corp.*, 57 B.R. 751, 754 (S.D. Ohio 1985).

Both parties agree on this definition but argue as to its application. The Trustee notes that the FDIC-R filed its Proof of Claim in November 2008 and that the adversary proceeding started in June 2009, almost two years before the Motion was brought. He argues that parties' grounds for dispute have been well-known for years and that the FDIC-R's motion to withdraw is an attempt to use § 157(d) as an "escape hatch" out of bankruptcy court.

The FDIC-R acknowledges that the original Complaint was filed June 11, 2009 but argues that the Motion to Withdraw is nevertheless timely because it was filed only twenty days after the Trustee filed the FAC in April 2011 and two months after formal mediation ended.

Though the Trustee argues the FDIC-R's delay is inexplicable, the Court disagrees. Less than a month after the Trustee filed his original Complaint, the parties stipulated to stay the adversary proceeding in order to resolve their dispute out of court. They have since extended the FDIC-R's last day to respond four additional times. Negotiations began around July 2009 and continued until formal mediation concluded in March 2011.

In *Security Farms*, a motion to withdraw filed six days after removal to federal court from state court was judged timely though the defendant had been brought into the case two years prior. 127 F.3d at 1007 n.3. The court reasoned that had the defendant attempted to withdraw any earlier, the defendant would have done so at the risk of sanctions and damages for violation of the automatic stay. *Id.*

To the extent that the Trustee argues that the FDIC-R should have filed the Motion in the midst of the parties' attempt to resolve the issues amicably, the Court disagrees. As in *Security Farms*, though the FDIC-R could have filed its Motion earlier, it would have done so at the risk of derailing the negotiations and mediation process, a process which only ended when the Trustee filed his FAC and MSJ. Under the circumstances, the FDIC-R acted promptly.

For the reasons stated above, the Court finds the Motion was timely.

### B.     Mandatory Withdrawal

The FDIC-R argues that the Court must withdraw the reference to Bankruptcy Court, pursuant to 28 U.S.C. § 157(d), because the determination of ownership will necessarily require substantial and material consideration of four non-Bankruptcy Code laws. The Trustee counters that the FDIC-R's assertions that these laws are necessary for resolution of the ownership issue do not rise above mere allegations and in any event, would not require complex application. The Court disagrees with the FDIC-R and finds mandatory withdrawal is not required.

Withdrawal is mandatory "if the court determines that resolution of the proceeding requires *consideration* of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (emphasis added). Courts have discussed that "consideration" cannot be read literally because doing would require withdrawing an overwhelming number of cases and would "'eviscerate much of the world of the bankruptcy courts.'" *In re Vicars*, 96 F.3d at 952 (quoting *In re Adelphi Institute, Inc.*, 112 B.R. 534, 536 (S.D.N.Y. 1990)). A district court should withdraw not when it speculates but rather when it affirmatively determines that substantial and material consideration of non-Code statutes is required. *See Ionosphere*, 103 B.R. at 419.

The FDIC-R raises four defenses, three of which involve the federal statute, 12 U.S.C. § 371c(c) (2006). The statute requires that "[e]ach loan or extension of credit to, or guarantee, acceptance, or letter of credit issued on behalf of, an affiliate by a member bank or its subsidiary shall be secured at the time of the transaction by collateral . . . ." *Id.*

The FDIC-R first argues that to the extent the tax refunds constitute a loan or extension of credit from the Bank to Bancorp, the transaction was uncollateralized and violated § 371c(c). The FDIC-R then alleges "any violation of the TSA that violates Section 371c(c)(1) is null and void." As support, it cites Section 7(a) of the TSA, which says: "[t]he parties shall abide by all rules promulgated *by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation*." (Mot., Ex. D, 137 (emphasis added).) The FDIC-R fails to explain how a violation of federal statute § 371c(c) falls under TSA Section 7(a), which discusses penalties for violating the rules of the OTS or the FDIC, nor how a violation of § 371c(c) would void the TSA.

The FDIC-R next argues that in the alternative, to the extent the TSA allocated ownership of the tax refunds in parent company Bancorp, it amounted to a violation of § 371c(c) because the statute prohibits a bank holding company, such as Bancorp, from appropriating a bank's tax refunds as its own property. This interpretation of § 371c, however, comes from the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the OTS and

the FDIC in *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 Fed. Reg. 64757 (Nov. 23, 1998) ("*Interagency Policy Statement*"). Section 157(d) only requires consideration of laws, not non-binding policy statements. The Bankruptcy Court may choose to consider the *Interagency Policy Statement*, but it is not material to adjudicate the ownership issue.

Next, the FDIC-R turns to a regulation that it alleges implicates § 371c(c). The regulation allows the OTS to divest or unwind a transaction that it finds was, in substance, a loan or extension of credit. 12 C.F.R. § 563.41(c)(1)(ii) (2011). The FDIC-R argues unwinding a transaction here would constitute an unwinding of the TSA. However, the OTS has not taken any action yet. Barring future OTS action, the Bankruptcy Court need not consider this regulation to adjudicate the ownership issue.

Lastly, the FDIC-R argues that the Court will have to substantially and materially consider 26 C.F.R. § 1.1502-77 (2010) to resolve the ownership issue. The FDIC-R argues that this Treasury Regulation only allows a parent company in a consolidated tax group, such as the group formed by the TSA, to act in the capacity of an "agent." Therefore, Bancorp is precluded from taking ownership of the refunds through the TSA in its limited role as agent.

In support of its proposition, the FDIC-R cites to *In re Bob Richards Chrysler-Plymouth Corp., Inc.*, 473 F.2d 262, 265 nn.6 & 7 (9th Cir. 1973). But there, the parties were functioning without a tax sharing agreement. *Id.* at 265. Moreover, that court specifically said that the Regulation is "basically procedural in purpose and [was] adopted solely for the convenience of the protection of the federal government. The Internal Revenue Service is not concerned with the subsequent disposition of tax refunds and none its regulations can be construed to govern this issue." *Id.* Additionally, other courts have held that this Regulation does not affect the entitlement of members of a consolidated tax group. *See In re First Cent. Fin. Corp.*, 269 B.R. 481, 489 (E.D.N.Y. 2001), *aff'd*, *Superintend. of Ins. v. Ochs*, 377 F.3d 209 (2nd Cir. 2004).

Overall, the FDIC-R has not satisfied its burden of persuasion that the Court must substantially and materially consider non-Bankruptcy Code laws in order to resolve the ownership issue. Furthermore, bankruptcy courts adjudicating cases involving tax refund ownership between holding companies and failed financial institutions, have not reached these issues. In the event that the Bankruptcy Court does substantially and materially consider non-Bankruptcy laws in determining ownership, the parties can take that up on appeal. *See Ionosphere,* 103 B.R. at 420.

For the reasons stated above, the Court does not find that the non-Bankruptcy issues mandate withdrawal.

### C. **Permissive Withdrawal**

Even if mandatory withdrawal is not required, the FDIC-R contends that the Court should withdraw the reference on its own discretion, pursuant to § 157(d), because the ownership issue is a non-core proceeding. For the following reasons, the Court declines to withdraw.

Core proceedings are those that either arise under Title 11 or arise in a bankruptcy case. *Stern v. Marshall*, No. 10-179, slip op. at 9 (U.S. June 23, 2011). A proceeding is not core if it is "otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1). If the proceeding resides at the core of federal bankruptcy power, the Bankruptcy Court can enter a final judgment. 28 U.S.C. § 157(b)(1). If, on the other hand, the proceeding is non-core, a bankruptcy court can only enter proposed findings of fact and conclusions of law. 28 U.S.C. § 157(c)(1).

The Trustee, in arguing that the ownership issue is core, points to § 157(b)(2)(C), which provides that "counterclaims by the estate against persons filing claims against the estate" are core. The Supreme Court, in *Stern v. Marshall*, recently addressed counterclaims under this statute. There, Vicki Lynn Marshall had filed a counterclaim for tortious interference with an *inter vivos* gift of approximately half of her husband's fortune, by her step-son E. Pierce Marshall, who had initially filed a defamation claim in her bankruptcy proceeding. *Stern* at 3-4.

The Court held that while "§ 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution does not." *Id.* at 16. Distinguishing from prior cases which considered trustees' counterclaims against proofs of claim, the Court noted that whereas those counterclaims "assert[ed] a right of recovery created by federal bankruptcy law," the tortious interference claim was "in no way derived from or dependent upon bankruptcy law." *Id.* at 33-34.

The Trustee's counterclaim here suffers a similar defect. First, it is insufficient to simply meet Congress' definition of core under § 157(b)(2)(C). Though the Court seemed to imply that a bankruptcy court might have final judgment over a claim that "would necessarily be resolved in the claims allowance process," the Court ultimately held that Vicki's counterclaim failed because it did not "fall[] within one of the 'limited circumstances' covered by the public rights exception." *Id.* at 34. "[W]hat makes a right 'public' rather than private is that the right is integrally related to particular federal government action." *Id.* at 25. Here, the Trustee's counterclaim over whether a bank or its parent holding company owns the tax refunds is a dispute between private parties. The Trustee's counterclaim is a non-core proceeding under § 157(b)(2)(C).

Next, *In re Kincaid* does not provide support for the Trustee's contention that the ownership dispute is a core proceeding. 917 F.2d 1162 (9th Cir. 1990). There, the court held the proceeding was core under § 157(b)(2)(A). *Id.* at 1165. Subsection (A) is a "catch-all" provision and should be read narrowly to avoid constitutional problems. *In re Harris*, 590 F.3d 730, 740-41 (9th Cir. 2009). Moreover, *Kincaid* relied on analysis of Bankruptcy Code, federal law and state law. *Kincaid*, 917 F.2d at 1165-67. Here, the ownership dispute arises out of the TSA, a prepetition state-law contract claim. *See Harris*, 590 F.3d 730 at 741 (distinguishing post-petition contracts as public right suits from traditional, pre-petition contracts as private right suits). *Kincaid* does not alter the Court's finding that the ownership dispute is not a core proceeding.

Thus, the FDIC-R is correct that the ownership dispute is non-core. However, the permissive withdrawal analysis does not end at the core/non-core determination. Considering other factors like the efficient use of judicial resources, the Court finds the Bankruptcy Court is the appropriate forum to first hear this case.

To start, the Bankruptcy Court has greater familiarity with the facts and holds a unique vantage point from the center of the overall bankruptcy proceeding. Withdrawal is also likely to increase costs as it would not only cause parties to duplicate some efforts, such as the MSJ already pending in the Bankruptcy Court, but withdrawal would also invite entirely new disputes as well, such as the FDIC-R's imminent motion for transfer of venue. And though the FDIC-R has only suggested it would move for transfer of venue to consolidate with the DC Action, the Court would be disinclined to transfer there when the bankruptcy proceeding is here and when this adversary proceeding was filed before the DC Action. Under the circumstances, a de novo review here would an efficient use of judicial resources. The decision to decline withdrawal is further bolstered by the knowledge that bankruptcy courts routinely resolve these types of disputes, as stated above.

Accordingly, the Court declines to permissively withdraw the reference of this non-core proceeding.

## V. CONCLUSION

In light of the foregoing, the Court **DENIES** Defendant's Motion to Withdraw the Reference.

**IT IS SO ORDERED.**

|  |  : |
| --- | --- |
| Initials of Preparer | slw |